**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

WESTCHESTER FIRE INSURANCE )
COMPANY, as Subrogee of the Hammond )
Group, Inc., )
      )
          Plaintiff, )
      )
      v. )        CASE NO. 2:03-CV-178-TS
      )
AMERICAN WOOD FIBERS, INC., )
      )
          Defendant. )

## OPINION

This matter is before the Court on the Defendant's Motion for Summary Judgment, filed on August 31, 2005. This case arises out of a fire that occurred at Hammond Expanders on August 8, 2001. Plaintiff Westchester Fire Insurance Company is suing as subrogee of the Hammond Group, who owns the Hammond Expanders Plant. Defendant American Wood Fibers manufactures wood flour and sold wood flour to Hammond Expanders. Hammond Expanders stored the flour in bags on pallets inside the plant. The Plaintiff is suing American Wood Fibers on the theory that the fire that destroyed the Hammond Expanders Plant was caused by spontaneous combustion, that is, self-ignition, of wood flour supplied by American Wood Fibers and that American Wood Fibers is liable for the fire damage because their wood flour was defective and carried no warning of the possibility of spontaneous combustion.

**A.     Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). After adequate time for discovery, summary judgment must be given against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548,

2

558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Only material facts will preclude summary judgment; irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Anderson*, 477 U.S. at 248–49. If there is no genuine issue of material fact, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisc. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but

instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443. However, a party's evidence must be "competent evidence of a type otherwise admissible at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

**B.      Material Facts**

Resolving all genuine disputes and drawing all reasonable inferences in the Plaintiff's favor, the following facts are presumed true for the purposes of deciding whether summary judgment is appropriate.

American Wood Fibers processes wood remnants into wood flour. Their manufacturing process creates wood flour uniform in particle size and composition. The flour is dried by blowers and packed by air compression in one way kraft paper bags. Each bag is fifty pounds. The bags include a warning that wood flour is combustible and that wood dust is an explosion hazard. The warning also states open flames and sparks should be kept away from wood flour and that wood flour should be stored in a dry, cool, clean and ventilated area. The warning does not mention spontaneous combustion.

The Hammond Expanders facility was destroyed by fire on August 8, 2001. The building was made primarily of concrete and steel and consisted of a one-story section joined to a two-story section, with an attached three-story office building of the same height as the two-story section. The plant used wood flour and other materials to manufacture a form of paste or expander that is put into the electrolyte of automotive batteries to extend their charge life. The compressor room was in the northwest part on the ground floor. Wood flour was stored outside of the compressor room. Between the wood flour pallets and the south wall of the compressor room was a wooden overhead garage

door. The wood flour was stacked two pallets high, two pallets deep, and about five pallets wide.

On the day of the fire, the outside temperature reached 95 degrees Fahrenheit, and was the hottest of a long stretch of extremely hot and humid days. The garage door between the compressor room and the wood flour storage area was open at the time of the fire. Employees would open the door when the compressor room became too warm to release heat into the rest of the facility.

On August 8, 2001, around 5:30 a.m., a fire started at the Hammond Expanders plant. Plant personnel saw smoke and called 911. The Hammond fire department responded, but could not save the building. The one-story section was destroyed and the two-story section was badly damaged.

There is a dispute over the cause of the fire. The Plaintiff argues the wood flour spontaneously combusted. As considered further below, there is a material issue of fact as to whether spontaneous combustion of wood flour caused the fire. The Plaintiff's causation evidence consists mainly of the testimony of four experts. Two of the experts, David Bellis and Robert Lucas, relied on witness statements, burn patterns, and their expertise to determine that the starting location of the fire was the wood flour stored outside of the compressor room. They saw no potential ignition source in the area other than the wood flour.  They discovered the wood flour pile to be shaped like a dome, with the unburned dome surrounding a smouldering center. A third expert, Russell Ogle, consulted scientific literature and performed testing to determine whether this pattern was consistent with spontaneous combustion. They determined that it was. The Plaintiff's fourth expert, Jimmie Oxley, consulted scientific literature to determine whether spontaneous combustion of the wood flour was possible in the conditions at Hammond Expanders and the configuration the wood flour was stored. She determined that it was scientifically possible for the wood flour to spontaneously combust.

There is also a dispute as to the Hammond Group's knowledge of the dangers of spontaneous combustion of wood flour. The Defendant argues that the Hammond Group knew, or should have known, that wood flour could spontaneously combust. The Plaintiff responds with an affidavit of the foreman of the Hammond Expanders factory, James Fowler, that they did not know wood flour could spontaneously combust and that they would have relied on safety instructions to avoid spontaneous combustion if they had been warned. There is a material issue of fact on this issue as well.

### C.      Procedural Background

The Plaintiff filed its Complaint on May 15, 2003. The Complaint contained two counts: one for negligence and the second for strict liability in manufacturing and selling the wood flour. The Defendant moved for summary judgment on August 31, 2005. The Plaintiff responded on October 4, 2005. The Defendant replied on October 24, 2005. On the same day, the Defendant filed its motions to strike the affidavits of James Fowler and Jimmie Oxley. The Plaintiff responded on November 4, 2005, and the Defendant replied on November 14, 2005.  On November 2, 2005, the Plaintiff filed its motion to strike the Defendant's Reply due to it being filed late. The Defendant responded on November 17, 2005. The Defendant moved to strike the testimony of Gary Steen and Joseph Hoffman on November 15, 2005, to which the Plaintiff responded on November 29, 2005, and the Defendant replied on December 8, 2005.

### D.      Motions to Strike

### (1)      *Defendant's Motion to Strike the Affidavit of James Fowler*

6

The Defendant argues that part of James Fowler's affidavit must be stricken because he gives no basis that his statements are within his personal knowledge. The Defendant challenges three paragraphs. In paragraph three, Fowler states that Hammond Expanders used wood flour from American Wood Fibers and relied upon them for proper warnings and instructions. In paragraph four, he states that the wood flour provided by American Wood Fibers contained no warnings that the flour could self heat and spontaneously combust and provided no instruction on how to avoid spontaneous combustion. In the fifth paragraph, he says the Hammond Group was not aware of the fact that wood flour could spontaneously combust and that Hammond Expanders would have handled the wood flour differently had it been so warned.

Federal Rule of Civil Procedure 56(e) states: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

Fowler's affidavit shows he is competent to testify to the matters he does, because he states that he is the General Foreman of Hammond Expanders. A witness may give opinions when they are based on or inferred from his own observations. *See* Fed. R. Evid. 602, 701. As foreman of the factory, common sense suggests Fowler has personal knowledge of the products used in the Hammond Expanders factory and the methods and practices at the factory regarding the use of those products, including the reliance placed on warnings and instructions. *Davis v. Valley Hospitality Servs., LLC*, 372 F. Supp. 2d 641, 653 (M.D. Ga. 2005) ("[C]ommon sense dictates that if an affiant is an employee of a company, she has personal knowledge of events and circumstances that occurred at the company within her sphere of observation."). Also, he states that he has personal knowledge

of the operations of Hammond Group at the time the fire occurred. With his observations and experiences as foreman, Fowler can testify that the Hammond Group was not aware wood flour could spontaneously combust and that it would have handled wood flour differently had it been warned.

### *(2)*     *Defendant's Motion to Strike Oxley's Affidavit*

The Defendant argues that Oxley's affidavit must be stricken because it impermissibly contradicts her deposition testimony and supplements her expert report in violation of Federal Rule of Civil Procedure 26. The Defendant's Motion identifies no contradiction between her deposition testimony and her affidavit and points to no opinion in her affidavit that is not in her expert report. In its Reply, after rehashing summary judgment arguments for excluding Oxley's testimony under Federal Rule of Evidence 702, the Defendant identifies one issue: Oxley relied on an article in her affidavit that she did not rely on in her expert report.

After extensive review of Oxley's deposition, report, and affidavit, the Court declines to strike Oxley's affidavit. "[W]here the deposition testimony is ambiguous or incomplete, as it is here, the witness may legitimately clarify or expand upon that testimony by way of an affidavit." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999). Parts of Oxley's deposition were ambiguous or incomplete and her affidavit helps to clarify her deposition statements. The Court sees no contradiction between her deposition and the affidavit, and the Defendant has not pointed to any.

As to whether the Oxley's affidavit impermissibly supplements her expert report in violation of Rule 26(e), the Court finds that it does not. Rule 26(a)(2)(B) requires expert reports to express

8

the expert's opinions and the basis for those opinions. Rule 26(e) requires a party to supplement its

26(a) disclosure requirements, including expert reports and depositions, if the information is in some

material respect incomplete or incorrect. Though citing a new article adds to the basis for her

opinion, it is not a material change in the basis. The article discusses the causes of spontaneous

combustion in wood chips and sawdust and the portion cited by Oxley states that "[t]he direct

chemical oxidizations probably become important above 42°C." (Spontaneously Combustible

Solids; A Literature Survey, Naval Surface Weapons Center, White Oak Lab (May 1975), Def. Ex.

19; DE 47). This adds no new information to Oxley's report; her report relies on a graph from

another article for the same information. (Oxley Report, Figure 1, Def Ex. 12; DE 42.) Also, the

Defendant has shown no prejudice from not having this article during Oxley's deposition. The

Defendant does not question the reliability of either the article Oxley relied on in her report or the

new article she cites in her affidavit.

If Oxley's citation of the new article was material, the Court would find that it was harmless

under Federal Rule of Civil Procedure 37(c)(1), and would not strike it. Oxley's opinion is supported

by information from the other articles she cites, and excluding this article would make no difference

in the outcome of the Defendant's motion.

### (3)    *Plaintiff's Motion to Strike the Defendant's Reply*

The Plaintiff seeks to strike the Defendant's Reply because it was filed late. The Court finds

the Reply was not filed late because, pursuant to Federal Rule of Civil Procedure 6(a) and (e), the

Defendant had until October 24, 2005, to file its Reply. The Defendant filed its Reply on that day.

The Plaintiff's motion to strike the Defendant's Reply is denied.

9

**E.      Admissibility of Oxley's Testimony Under Federal Rule of Evidence 702**

The Defendant challenges the admissibility of Oxley's testimony under Federal Rule of Evidence 702. It does not challenge the admissibility of any of the Plaintiff's other experts, though it does contest the sufficiency of those experts to create an issue of material fact as to the cause of the fire.

*(1)      Standard for Admitting Expert Testimony*

For expert testimony to be admissible, it must be relevant and reliable, as required by Federal Rule of Evidence 702. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals , Inc.*, 509 U.S. 579 (1993), listed several factors to be considered when determining whether scientific evidence is reliable: 1) whether the theory or technique can be or has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) a technique's "known or potential rate of error and the existence and maintenance of standards controlling the technique's operation;" and 4) whether the theory or technique has gained widespread acceptance in the relevant scientific community. *Id.* 593–94. Also, the 2000 Advisory Committee's Notes to Rule 702 suggest other factors to determine expert reliability, including:

> (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (7) "[w]hether the

10

> expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion";
> (8) "[w]hether the expert has adequately accounted for obvious alternative explanations";
> (9) "[w]hether the expert is being as careful as he would be in his regular professional work
> outside his paid litigation consulting"; and (10) "[w]hether the field of expertise claimed by
> the expert is known to reach reliable results for the type of opinion the expert would give."

*Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir. 2005) (quoting Fed. R. Evid. 702 advisory

committee's notes (2000 amendments)). The list is not exclusive, and the Supreme Court

emphasized the inquiry is a flexible one: "Its overarching subject is the scientific validity  and thus

the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The

focus, of course, must be solely on principles and methodology, not on the conclusions that they

generate." *Daubert*, 509 U.S. at 594–95. A witness's own training and experience may be the

foundation for an expert opinion, but "the witness must explain how that experience leads to the

conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts." Fed. R. Evid. 702 (advisory committee's notes (2000

amendments)). The burden of showing an expert's testimony to be relevant and reliable is with the

proponent of the evidence. *Bradley v. Brown*, 852 F. Supp. 690, 697 (N.D. Ind. 1994).


### (2)    Analysis

In her expert report and deposition testimony, Oxley gave her opinion that spontaneous

combustion of the wood flour stored at Hammond Expanders was possible under the conditions it

was exposed to. Her conclusion that spontaneous combustion was possible along with the

conclusions of the Plaintiff's other experts led Oxley to conclude that spontaneous combustion

caused the fire. The Defendant questions whether Oxley's conclusions are based on sufficient facts

or data and whether she reliably applied the science concerning spontaneous combustion. The

Defendant does not question Oxley's qualifications and the parties appear to agree on most of the scientific principles that explain spontaneous combustion. Several articles and book excerpts dealing with spontaneous combustion relied on by the parties have been submitted as exhibits. None of these articles has been called into question. The Defendant offers few citations to scientific literature in support of its arguments that Oxley required more data to support her conclusions. The Court's review of these materials and Oxley's report and deposition testimony leads it to conclude that Oxley has reliably applied the principles in question and has based her conclusions on sufficient facts and data.

For the most part, the general scientific principles underlying spontaneous combustion relied on by the Plaintiff's experts are undisputed. For spontaneous combustion to be possible, the material needs to be susceptible to self-heating and self-heating must be sufficient to lead to thermal runaway. Thermal runaway is self-heating that rapidly accelerates to high temperatures, often leading to smoldering or flaming. Self-heating occurs when the rate at which heat is generated is greater than the rate heat is dissipated. Self-heating can be the result of biological activity or chemical oxidation or both. Chemical oxidation is the process in which molecules of a substance react with molecules of oxygen in the air, generating heat. Wood flour, like sawdust and wood chips, is a material susceptible to self-heating.

Spontaneous combustion can only occur if the ambient temperature is hot enough and the pile is large enough. The larger the pile, the more likely it is to spontaneously combust. Also, the greater the temperature of the air surrounding the pile, the more likely the pile is to spontaneously combust because high surrounding temperature restricts heat loss. The size of the pile is related to the critical temperature at which spontaneous combustion can occur: the higher the surrounding

temperature, the smaller the critical radius, and vice versa.

Other factors affect the heat generation and dissipation and allow spontaneous combustion to occur at a temperature or pile size that it otherwise would not. One obvious factor is the composition of the substance itself. Different materials have different rates of oxidization. Pine wood flour is more likely to spontaneously combust than wood flour from other types of trees because it contains more extractives that oxidize at a higher rate. Another factor is the existence of insulating factors that hinder the dissipation of heat, such as being piled against a wall. Also, finely divided materials are more likely to combust. More of the surface of the material is exposed to oxygen in finely divided materials, and finely divided materials accumulate heat more easily. Finally, the longer a combustible material sits, the more likely it is to spontaneously combust.

i.     *Reliability of Oxley's Opinion that Biological Activity Occurred*

It is Oxley's opinion that conditions were such that biological activity within the wood flour was possible, and this led to spontaneous combustion. The Defendant argues that for Oxley to conclude biological activity was possible, she had to know how much moisture is required for biological activity and test the Defendant's wood flour. Because Oxley has no testing or data supporting her conclusions, the Defendant claims her conclusions are unreliable. The Plaintiff argues that testing was impossible and the relevant data unavailable. The Court agrees. A new wood flour sample would be in a different condition than the wood flour that existed at Hammond Expanders immediately before the fire. Wood flour from the fire site would be contaminated by the fire and fire fighting activity. Thus, the moisture content of the wood flour at the only relevant time, the days before the fire, is not available. The Defendant does not specifically state what type of testing should

13

have been done or how any tests could provide the missing information.

The Defendant also misstates the record. The Defendant claims Oxley said a 20% moisture level would be required for biological activity and that she has no support for concluding that this level of moisture existed. That is incorrect; Oxley stated that a moisture level of 20% is probably too high for spontaneous combustion to occur because higher moisture levels allow greater dissipation of heat. (Oxley Dep. 103, Def. Ex. 18; DE 47.) Regarding what level of moisture is required for biological activity, Oxley stated in her deposition that "almost all organic material has biological activity, which is why we store our food in the refrigerator." (Oxley Dep. 104, Def. Ex. 18; DE 47.)

The Court finds that Oxley's method for reaching her conclusion to be sufficiently reliable. Because the level of moisture in the wood flour prior to the fire is unknown, to determine whether biological activity could have taken place in the wood flour, Oxley looked at what is necessary for biological activity to occur and determined whether those necessary conditions could have existed at Hammond Expanders before the fire. This method is reliable, as is her application of the method. It is undisputed that bio-organisms exist in organic compounds like wood flour and that moisture affects the level of biological activity. Also, the Defendant's process for making wood flour does not eliminate bio-organisms. Though the Defendant's wood flour is shipped at 8% moisture, according to the Defendant's webpage, that level is subject to change, depending on climactic conditions. (American Wood Fibers FAQ, at http://www.awf.com/industrial_faq.htm, Pl. Ex. P; DE 42.) Prior to the fire, the wood flour had been sitting in the Hammond Expanders factory for several months, it was stored next to the hot compressor room, the weather had been hot and humid, and the wood flour was insulated by the size of the pile and plastic wrap. Oxley's conclusion that the

necessary conditions—heat, moisture, and presence of bio-organisms—existed making biological activity leading to spontaneous combustion possible is a reliable application of the relevant scientific principles. The Defendant has not provided any evidence that biological activity was not possible under these conditions or cited any scientific literature calling into doubt the general principles or methods on which Oxley relied.

Also, even if no biological activity took place, Oxley stated that the conditions were sufficient for the wood flour to reach thermal runaway from chemical oxidation alone and, as stated below, that opinion is admissible under Rule 702. (Oxley Aff. 5, Pl. Ex. M; DE 42.) Thus, for purposes of summary judgment, even if Oxley's opinion as to the possibility of biological activity was found inadmissible, there would still be an issue of material fact as to whether chemical oxidation caused the Defendant's wood flour to spontaneously combust.

ii.     *Reliability of Oxley's Opinion Despite Her Failure to Calculate a Biot Number*

The Defendant argues that this conclusion is not scientific because she did not calculate the "biot number." The Defendant says that the biot number is the dimensionless ratio of surface heat transfer to bulk heat transfer, but cites to no scientific literature that further describes the calculation or states such a calculation is necessary to know whether spontaneous combustion is possible.

The Plaintiff argues that no biot calculation is necessary. The Plaintiff claims that using mathematical equations to determine whether spontaneous combustion was possible requires assuming values for variables. Because much of the necessary information regarding the conditions of the wood flour prior to the fire is not available, there is insufficient data to make the calculations reliable. The Court agrees; because assumptions are required for the calculations advocated by the

Defendant, the Court is not convinced calculating a biot number would result in greater reliability than the methods used by Oxley.

Rather than assuming values and using mathematical formulas, Oxley used a graph taken from a scientific article that suggests spontaneous combustion of the wood flour was possible if the ambient temperature around the wood flour was 40 degrees Celsius, or 104 degrees Fahrenheit. (Oxley Report, Def. Ex. 12; DE 36.) The graph shows that a sphere with a critical radius of 2 meters can spontaneously combust at about 40 degrees Celsius. Oxley said that the combination of other factors would make it possible for wood flour with a smaller critical radius to spontaneously combust, such as the added heat and air from the compressor room and the increased insulation of the wood flour from being wrapped in cellophane and stacked against a wall. (Oxley Dep. 124–126, Def. Ex. 18; DE 47.) The graph she cites supports her conclusion and the relevant scientific literature includes as factors increasing the likelihood of spontaneous combustion the same factors Oxley relied on. In her affidavit, she cites a literature survey that states direct chemical oxidations probably become important over 42 degrees Celsius. (Oxley Aff., Pl. Ex. M; DE 42.)

The Defendant suggests that Oxley said no biot number was needed only if real-world testing was conducted, and that she did not do any testing. The Defendant's interpretation of Oxley's statements is misleading. In her deposition, when discussing her reliance on the graph in her report, Oxley was asked whether an abstract calculation could be done to calculate the various factors related to spontaneous combustion and Oxley said there was not.

> Q.      . . . But is there—see this Biot number calculation relative to . . . wood flour that allows one to calculate this thermal reaction. Is there not an abstract way of calculating the air void or the oxygen void size, the heat generated from the oxidation of the wood flour and the amount of water and the amount of thermal dissipation that occurs to calculate the characteristics of spontaneous combustion over time?

A.    No. What people can calculate—the original question was from laboratory scale tests. What people can and do calculate is critical temperatures of thermal runaway. But in doing that calculation, if I'm now going to apply it to the real world, I will go out and test every time.

(Oxley Dep. 117–18, Def. Ex. 18; DE 47.) In the context of the rest of the questioning, taking all reasonable inferences in the Plaintiff's favor, it appears that Oxley meant that one cannot abstractly calculate the factors mentioned, but critical temperature can be calculated. However, in concrete applications, testing to determine the critical temperature is more reliable than calculations. The exchange occurs in the context of a discussion as to the type of laboratory testing used to create the graphs relating critical temperature to critical radius—the type of graph relied upon by Oxley. Because this type of testing was already done and collected in the graph, Oxley had no reason to do her own testing. (Oxley Dep. 124–126, Def. Ex. 18; DE 47.) Oxley never admitted a biot number was necessary and the Court agrees that it was not needed to make her conclusions reliable.

### iii.    Whether Oxley Failed to Determine the Critical Dimension for Wood Flour

A related objection is the Defendant's argument that Oxley never determined the critical dimension at which its wood flour could spontaneous combust. The Defendant quotes Oxley's deposition testimony where she says there are tests that can be done to calculate critical radius and that those tests were not done. However, Defendant leaves off her following statement that "Maybe I should add that even if you did those tests, it would be hard to know that you were duplicating exactly the conditions of this wood flour." (Oxley Dep. 141, Def. Ex. 18; DE 47.) Rather than testing based on unreliable estimations as to what the conditions were at Hammond Expanders during the time the wood flour was there, to determine whether the wood flour pile was sufficiently large to allow for spontaneous combustion in the temperature ranges it was likely exposed to, Oxley relied

17

on the Canadian Research Council graph and other scientific literature. The graph Oxley relied on shows the critical radius for pine sawdust at 40 degrees Celsius as around two meters.

The Court finds Oxley's methods and conclusions to be reliable. Though she did not calculate the critical radius for wood flour, she relied on the graph to determine the critical radius for pine sawdust. It is not clear what the Defendant thinks further testing might show. The Defendant has not questioned the reliability of the Canadian Research Council's work, and Oxley does not need to confirm their results with further testing for her opinion to be reliable.

iv.    *Whether Oxley's Failure to Calculate the Void Volume of Wood Flour Makes Her Opinion Unreliable*

The Defendant argues Oxley stated that a propensity to self heat depends on the oxidation, which in turn depends on the size of the voids between the particles, and that she made no calculation as to what the void volume of wood flour could be. This argument also fails. It is not true that Oxley made no calculation. For the purpose of calculating the amount of heat that would be generated by the oxidization of all oxygen packed in the wood flour bag, Oxley used the Defendant's expert's void volume calculation of 39%. She found that the temperature would rise 6 degrees Celsius, an amount she characterized as certain to result in spontaneous combustion. (Oxley Dep. 93–98, Def. Ex. 18; DE 47.) Thus, Oxley's opinion is that even under the Defendant's own calculations of void volume, spontaneous combustion was possible. Failing to make an independent void volume calculation does not affect the reliability of her opinion.

v.    *Whether Oxley Has Shown There To Be Sufficient Oxygen To Allow Spontaneous Combustion*

The Defendant also disagrees with Oxley's conclusion that bags of wood flour with 39% void volume could self-heat by 5.97 degrees Celsius by oxidizing the amount of oxygen contained in the bag. The Defendant simply disagrees with her calculation and offers no argument as to why it is wrong. The Defendant also argues that heating a portion of the wood flour by 6 degrees Celsius is insufficient to cause spontaneous combustion because there was insufficient oxygen to allow oxidation to generate sufficient heat for spontaneous combustion. Oxley disagrees, and states in her affidavit that a 6 degree temperature variation would cause more oxygen and more material to become involved. (Oxley Aff. 7; DE 42.) At her deposition, Oxley stated there was plenty of oxygen because of the nature of the substance and the aerated stacking pattern. (Oxley Dep. 99–100, Def. Ex. 18; DE 47.) Her conclusion is also supported by the scientific literature. (Brian Gray, Spontaneous Combustion and Self-Heating 2-224, Pl. Ex. L; DE 42) (stating that packing porous materials by compression "increases the density (thus lowering the [critical ambient temperature]) and has virtually no effect on the availability of oxygen.") The Defendant has not shown Oxley's opinion to be unreliable in this regard.

vi.    *Whether It Was Necessary For Oxley To Identify the Extractives in the Wood Flour*

Next the Defendant argues Oxley failed to identify the extractives that she found in the wood flour that would make it more likely to spontaneously combust. Oxley identified the extractives as having the property that makes their presence important when considering the possibility of spontaneous combustion, which was whether they were oxidizable. Having found that they were oxidizable, further examination would be superfluous. The Defendant does not object to the testing methodology employed to identify the extractives as oxidizable compounds. Her conclusion is

supported by testing and is reliable.

vii.    *Whether Oxley Wrongly Applied Scientific Principles to the Bagged Wood Flour that Apply Only to Bulk Substances*

Finally, the Defendant indirectly raises the argument that Oxley was wrongly applying scientific articles to the wood flour stored at Hammond Expanders because the literature refers to bulk piles of combustible material and the wood flour at Hammond Expanders was bagged and on pallets. During her deposition, when asked whether there was a difference between bagged wood flour and bulk piles of wood flour, Oxley stated the difference is not large. Her view is supported by the scientific literature. "The larger the size of the body of material, the greater the likelihood of spontaneous ignition. By *size of the body* we mean the parts that are in thermal contact. A large pile of cotton bales with aisles through it would not necessarily be a large body in the thermal sense used here." (Brian Gray, Spontaneous Combustion and Self-Heating 2-224, Pl. Ex. L; DE 42.)

**(3)    *Summary***

Oxley's conclusion is that the available evidence shows it was scientifically possible for the wood flour to spontaneously combust under the conditions to which it was exposed and in the configuration in which it was stored. The Court, in exercise of its gatekeeping function under Rule 702, after considering the *Daubert* factors, finds Oxley's testimony to be admissible. Oxley's methodology was to first determine what conditions were necessary for spontaneous combustion to occur. She did this by consulting the scientific literature on the subject. The scientific principles she

20

relied on, including the graph showing pine sawdust to be combustible at 40 degrees Celsius, were the product of the testing of other scientists, published in peer reviewed articles, and are generally accepted within the scientific community. Then, she looked to whether these conditions could have existed at Hammond Expanders before the fire. Because of the nature of the fire, not all of the necessary information could be obtained. It is not known how moist the wood flour was, how exactly the wood flour was configured, or how high the ambient temperature around the wood flour was. Under these circumstances, a scientist must make assumptions. Most of the Defendant's objections relate to the fact that Oxley did little testing or mathematical calculation. Testing and calculation would also require assumptions, but the Court does not see how they would result in greater reliability. Though there is a high rate of error in making conclusions with so many unknown facts, the Court is not aware of a better method, and the Defendant has not shown there to be one. Oxley has "'good grounds,' based on what is known" for her conclusions. *Daubert*, 509 U.S. at 590. As stated by the *Daubert* court, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.

**F.      Sufficiency of Plaintiff's Causation Evidence**

Oxley's opinion is only a part of the Plaintiff's evidence that spontaneous combustion caused the fire. By itself, her testimony likely would be insufficient to show causation, but her testimony that spontaneous combustion was possible, combined with the testimony of the Plaintiff's other experts, is sufficient to create a genuine issue of fact as to whether spontaneous combustion of wood flour caused the fire.

Indiana's Products Liability Act governs actions brought by a user of a product against the product's manufacturer for physical harm caused by the product, "regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34- 20-1-1. Thus, the Act governs Plaintiff's strict liability and negligence claims. *U-Haul Int'l., Inc. v. Nulls Mach. & Mfg. Shop*, 736 N.E.2d 271, 281 (Ind. App. 2000). To establish a claim for liability under the act, a plaintiff must show "(1) the product was defective; (2) as a result of the defect, the product was unreasonably dangerous; (3) the defect existed when the product left the control of the defendant and reached the plaintiff without substantial alteration; (4) plaintiff was injured; and (5) plaintiff's injury was proximately caused by the product." *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1103 (S.D. Ind. 2003); Ind. Code § 34-20-2-1.

Because causation is an essential element of the Plaintiff's claims, to survive summary judgment, the Plaintiff must submit admissible evidence that the Defendant's product caused the fire. "When the issue of causation is within the understanding of a lay person, testimony of an expert witness is not necessary." *Smith v. Beaty*, 639 N.E.2d 1029, 1034 (Ind. App. 1994). The Plaintiff argues the fire was caused by the spontaneous combustion of the Defendant's wood flour. Spontaneous combustion is not a process within the understanding of a lay person and so the Plaintiff is required to produce admissible expert testimony to carry its burden in showing the Defendant's product caused the fire.

"By the very nature of fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony." *Standard Commercial Tobacco Co., Inc. v. M/V Recife*, 827 F. Supp. 990, 1001 (S.D.N.Y. 1993). Direct evidence of causation is not required; circumstantial evidence is sufficient if it allows a factfinder to draw a reasonable inference of

22

causation. *Smith v. Ford Motor Co.*, 908 F. Supp. 590 (N.D. Ind. 1995). "[A] plaintiff may use circumstantial evidence to establish that a manufacturing defect existed only when the plaintiff produces evidence by way of expert testimony, by way of negating other reasonable causes, or by way of some combination of the two." *Smith*, 908 F. Supp. at 593 (quoting *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1209 (7th Cir. 1995)); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 902 (7th Cir. 1994). However, a plaintiff is not required to negate every possible cause "no matter how speculative, remote, or unsupported by the record." *Smith*, 908 F. Supp. at 596.

The Plaintiff's evidence consists of the testimony, reports, and affidavits of four experts: David Bellis, a certified fire investigator with Engineering and Fire Investigations; Robert Lucas, a certified fire investigator with a company named Exponent; Russell Ogle, Ph.D., a chemist with Exponent; and Jimmie Oxley, Ph.D., a chemist. The sum of the Plaintiff's expert testimony is that the fire started in the location where the wood flour was stored, the wood flour was the only ignition source in the area, the evidence found after the fire was consistent with spontaneous combustion of the wood flour, and that the conditions that existed at the Hammond Expanders plant made spontaneous combustion of the wood flour possible. The Defendant challenges the Plaintiff's evidence, arguing that it is insufficient to show the fire was not caused by something other than spontaneous combustion of the wood flour and the possibility that its product, as manufactured and packaged, could spontaneously combust.

By first determining that the fire started where the wood flour was stored, the Plaintiff's experts eliminated all potential causes in other locations. Looking at the potential causes in the area of the wood flour, the experts found no other ignition sources and concluded spontaneous combustion was the most likely cause. First, there were no other viable ignition sources in close

23

proximity to the wood flour. Second, they found a smoldering region within a pile of unburned wood flour suggesting spontaneous combustion. They engaged in testing to determine whether this pattern was consistent with spontaneous combustion and found that it was. A second test simulating a fire starting outside of the wood flour pile did not result in a similar pattern. The testimony of the Plaintiff's experts that the only cause of fire that could have started in the wood flour storage area and left an unburned dome of wood flour surrounding a central charred region was spontaneous combustion of wood flour eliminates all other reasonable potential causes of the Hammond Expanders fire. Oxley's testimony that spontaneous combustion was scientifically possible supports their conclusion. If a jury believed the Plaintiff's experts, they could reasonably conclude that spontaneous combustion of the wood flour caused the fire. There is a genuine issue of material fact as to whether spontaneous combustion of the wood flour caused the fire.

**G.      Whether the Defendant Fulfilled its Duty to Warn**

The Defendant argues that it had no duty to warn that wood flour can burn because this condition is known to expected users. The Defendant's characterization of the issue is incorrect. Of course it is obvious that wood products can burn. The Plaintiff claims Hammond Expanders was unaware wood flour could cause a fire by spontaneous combustion. The question is whether the Defendant had a duty to warn that wood flour can spontaneously combust, that is, ignite on its own without the aid of any other ignition source.

Section 34-20-2-1 requires a plaintiff bringing a products liability claim to show a product was defective and the defect made it unreasonably dangerous. Ind. Code § 34-20-2-1. In failure to warn cases, the "unreasonably dangerous" inquiry is not a separate inquiry from whether the defect

24

is latent or hidden. *First Nat'l Bank &Trust Corp. v. Am. Eurocopter Corp.*, 378 F.3d 682, 690 n.5 (7th Cir. 2004). "A product is defective under this article if the seller fails to (1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product." Ind. Code. § 34-20-4-2.  "The determination of whether a duty to warn exists is generally a question of law for the court to decide rather than one of fact. However, the adequacy of the warning is a question of fact for the jury." *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997). "A manufacturer has a duty to warn with respect to latent dangerous characteristics of the product, even though there is no 'defect' in the product itself." *Id.*

The Court finds that spontaneous combustion is a latent dangerous characteristic of wood flour. That wood flour could, under certain conditions, spontaneously combust and ignite a fire is a dangerous and non-obvious characteristic. Thus, the Defendant had a duty to warn of this possibility and provide instruction on how to safely store wood flour to avoid spontaneous combustion.

The Defendant claims its warning was sufficient because it stated that its product can burn and recommended storage in a cool dry place. However, the warning makes no mention of spontaneous combustion and the Court finds that there is a material issue of fact as to the adequacy of the warning.

The Defendant also argues that summary judgment is appropriate because the sophisticated user doctrine discharges its duty to warn when the user knew or should have known the dangers associated with the product. The scope of this doctrine does not appear to be well defined by Indiana courts, and it is not clear how it relates to Indiana's statutory framework for product liability.

Nevertheless, Indiana courts have considered the doctrine, and the Seventh Circuit has recognized its existence. *Smock Materials Handling Co. v. Kerr*, 719 N.E. 2d 396 (Ind. Ct. App. 1999); *American Eurocopter*, 378 F.3d at 691 n.8.

A sophisticated user is one who has special knowledge, sophistication, or expertise in relation to the product. 63A Am. Jur. 2d *Products Liability* § 1163. "Under the 'sophisticated user' exception, there is no duty to warn when the dangers posed by the product are already known to the user." *Kerr*, 719 N.E.2d at 403 (quoting *Downs*, 685 N.E.2d at 163). Knowledge may be actual or constructive, and exists where the user knew or should have known of the dangers of a product. *Id.* at 403–404. Actual or constructive knowledge may be found where "the supplier has provided an adequate explicit warning of such dangers or information of the product's dangers is available in the public domain." *Id.* This is almost always a question of fact. *Id.* The doctrine is an affirmative defense, and the burden of proof is on the Defendant. *Id.* at 403 (titling relevant section "Analysis—'Sophisticated User' Defense"); 63A Am. Jur. 2d *Products Liability* § 1215 ("[T]he manufacturer which claims to have no duty to warn because of the knowledge of the user has the burden to offer evidence that the danger was or should have been obvious or known.").

James Fowler states in his affidavit that Hammond Expanders had no knowledge of the dangers of spontaneous combustion and relied on the Defendant for instruction on use and storage of wood flour. The Defendant attempts to show Hammond Expanders to be a sophisticated user by pointing out Hammond Expanders had problems with hot bags of its own product having to be segregated to avoid combustion. Also, the Defendant argues Hammond Expanders is a sophisticated user because it mixes wood flour to create its final product, and knows the potentially dangerous attributes of wood flour.

26

Whether Hammond Expanders was a sophisticated user and whether it should have known of the dangers of spontaneous combustion of wood flour is a question of fact for the jury. Fowler's affidavit is sufficient to raise a genuine issue of fact whether Hammond Expanders was a sophisticated user. Even without Fowler's testimony, the Defendant does not have sufficient evidence to carry its burden and prove as a matter of law that Hammond Expanders had the requisite knowledge.

**H.      Other Matters**

*(1)      Plaintiff's Motion for Sanctions*

Unrelated to the motion for summary judgment, the Plaintiff filed for sanctions on December 9, 2005, arguing that the Defendant did not come to a mediation conference with all individuals necessary to engage in good faith settlement negotiations. The Defendant responded on December 19 that it engaged in negotiations in good faith.

Local Rule 16.6 for the Northern District of Indiana states that the Indiana Rules for Alternative Dispute Resolution apply to ADR Processes. N.D. Ind. L. R. 16.6. Indiana ADR Rule 2.7(B)(2) states: "All parties, attorneys with settlement authority, representatives with settlement authority, and other necessary individuals shall be present at each mediation conference to facilitate settlement of a dispute unless excused by the court." Indiana ADR Rule 2.7(B)(2). It appears from the evidence submitted by the Plaintiff that not all necessary parties for the Defendant appeared at the mediation conference.

Indiana ADR Rule 2.10 states: "Upon motion by either party and hearing, the court may impose sanctions against any attorney, or party representative who fails to comply with these

mediation rules, limited to assessment of mediation costs and/or attorney fees relevant to the process." Indiana ADR Rule 2.10. The Court declines to exercise its discretion to impose sanctions on the Defendant. The Defendant's violation is not part of a pattern of bad behavior, is not terribly egregious, and does not appear to have been done in bad faith. Also, there were many other issues that prevented successful mediation other than the absence of all necessary parties.

### (2)       *Defendant's Motion to Bar the Testimony of Gary Steen and Joseph Hoffman*

The sufficiency of the Plaintiff's evidence of damages was not challenged by the Defendant's motion for summary judgment, yet the Defendant seeks to bar testimony of two of the Plaintiff's witnesses, Gary Steen and Joseph Hoffman, insofar as they might testify at trial to the Plaintiff's damages. Gary Steen is an insurance adjuster who was an employee of the Plaintiff Westchester and was primarily responsible for handling the payment of claims submitted by the Hammond Group arising from the fire that burned down their plant. Joseph Hoffman is a public adjuster who assisted the Hammond Group in obtaining payments on its insurance claim from Westchester. The Defendant offers two reasons to strike their testimony. First, the Defendant argues Steen and Hoffman are experts and no expert report was filed as required by Federal Rule of Civil Procedure 26(a)(2). Second, the Defendant claims their testimony is not relevant because it addresses only replacement cost, and the standard for damages in this case is fair market value. In its reply, the Defendant raises for the first time the argument that the testimony of Steen and Hoffman must be stricken because it was not provided in response to an interrogatory request. The Court finds that this argument is deficient because the Plaintiff's interrogatory answers were sufficient.

The Defendant's motion to strike the testimony of Steen and Hoffman is denied. Because

Steen and Hoffman were not retained, Rule 26(a)(2) does not require them to file a report. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756–57 (7th Cir. 2004). Rule 26(a)(2)(B) states that the disclosure of the identify of an opinion witness must be accompanied by a report "with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). As stated by the *Musser* court, "[t]he commentary to Rule 26 supports this textual distinction between retained experts and witnesses providing expert testimony because of their involvement in the facts of the case: a 'treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.'" *Musser*, 356 F.3d at 757 (quoting Fed. R. Civ. P. 26 advisory committee's notes (1993 amendments)). Steen and Hoffman are comparable to treating physicians. Their involvement in this case was to negotiate and determine the amount Westchester would have to pay on the Hammond Groups' policy for the factory. They have knowledge of this case from their own experience and observations. Their involvement in this matter is not primarily to provide expert testimony. As such, they belong to the class of experts that did not need to file expert reports under Rule 26(a)(2)(B). Also, the Plaintiff identified Steen and Hoffman as fact and opinion witnesses and the Defendant had ample opportunity to depose them as such.

The Defendant also seeks to bar the testimony of Steen and Hoffman as irrelevant because their testimony relates to replacement cost and the Defendant can only be liable for the fair market value of the building. At this time, on the facts before it, the Court cannot exclude the testimony of Steen and Hoffman as irrelevant. The proper measure for damages and whether the issue is for the jury will be determined at a later stage in proceedings when the Court has heard more argument if the parties cannot agree on the issue.

**ORDER**

For the reasons stated above, the Defendant's motions to strike [DE 45, 46, 53] are DENIED.

The Plaintiff's motion to strike [DE 48] is DENIED. The Defendant's Motion for Summary

Judgment [DE 36] is DENIED. The Plaintiff's Motion for Sanctions [DE 61] is also DENIED.

SO ORDERED on March 21, 2006.

/s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT